**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INDUS APPAREL, USA INC., a New York corporation,<br><br>       Plaintiff,<br>v.<br><br>BANGLADESH EXPORT IMPORT COMPANY LTD., a Bangladeshi corporation; AHMED SOHAIL FASIHUR RAHMAN, an individual; AHMED SHAHRYAR RAHMAN, an individual; AHMED SHAYAN RAHMAN, an individual; BEXIMCO FASHIONS LIMITED, a Bangladeshi corporation; BEXTEX GARMENTS LIMITED, a Bangladeshi corporation; CRESCENT FASHION & DESIGN LTD., a Bangladeshi corporation; ESCORP APPARELS LIMITED, a Bangladeshi corporation; ESSES FASHIONS LTD., a Bangladeshi corporation; INTERNATIONAL KNITWEAR AND APPARELS LTD., a Bangladeshi corporation; NEW DACCA INDUSTRIES LTD., a Bangladeshi corporation; and RR GLOBAL TRADING FZE, a United Arab Emirates corporation;<br><br>       Defendants. | Case No.: 23-cv-10426-KPF<br><br><br>**FIRST AMENDED COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Indus Apparel, USA Inc. ("Indus"), based upon personal knowledge as to all acts or events that it has undertaken or witnessed, and upon information and belief as to all others, asserts causes of action against Defendants Bangladesh Export Import Company Ltd. ("Beximco"), Ahmed Sohail Fasihur Rahman, Ahmed Shahryar Rahman, Ahmed Shayan Rahman, Beximco Fashions Limited, Bextex Garments Limited, Crescent Fashion & Design Ltd., Escorp Apparels Limited, Esses Fashions Ltd., International Knitwear and Apparels Ltd., New Dacca Industries Ltd., and RR Global Trading FZE, and alleges as follows:

## INTRODUCTION

1.      Indus is a successful product design, development, and sales services company headquartered in New York City.  It has decades of experience in the textiles and apparel industry and has developed fruitful and enduring relationships with countless suppliers, distributors, and retailers throughout the world.  In 2017, Indus partnered with Beximco, one of South Asia's largest textile manufacturers based in Bangladesh, to help Beximco develop its then-nascent presence in the United States and Canada.

2.      The parties memorialized their partnership by executing a Sales Agency Agreement (the "Agreement," attached hereto as **Exhibit A**).  Under the Agreement, Beximco appointed Indus as its "exclusive sales representative" for products sold to customers in the United States and Canada.  As Beximco's sales representative, Indus would promote and market Beximco's products in the United States and Canada, introduce Beximco's personnel to retailers and other customers in North America, chase any leads provided by Beximco, conduct market research on Beximco's behalf, advise Beximco on potential market opportunities, and follow up with Beximco's existing customers to cultivate long-lasting and profitable relationships.  To ensure Indus receives appropriate compensation for its efforts, the Agreement prohibits Beximco and its affiliates from directly or indirectly selling Beximco's products to customers in the United States and Canada without Indus's involvement.  The Agreement also requires Beximco to pay Indus a five-percent commission on all sales to customers in the United States and Canada, provide Indus with monthly reports containing detailed sales information, and permit Indus to periodically conduct an audit of Beximco's accounting records.  Indus entered the Agreement optimistic that it could significantly expand Beximco's business in North America, resulting in substantial profits for both parties.  Unbeknownst to Indus, however, Beximco never intended to honor its contractual obligations.

3.     After executing the Agreement, Indus immediately began fulfilling its duties to serve as Beximco's sales representative.  It provided general sales and marketing services to Beximco in North America, introduced Beximco to major North American retailers, arranged meetings with buyers, followed up on leads provided by Beximco, conducted market research, and advised Beximco on market opportunities within the United States.  As a result of Indus's efforts, Beximco's sales in the United States and Canada grew.  Within a few years of signing the Agreement, Beximco's sales more than doubled, collectively totaling tens of millions of dollars.

4.     Despite that success (and Indus's considerable efforts), Beximco blatantly ignored its contractual duties.  Even though Beximco's sales in the United States and Canada have totaled hundreds of millions of dollars since signing the Agreement, Beximco has paid Indus less than $220,000 in commissions, depriving Indus of millions of dollars in earned commissions, in direct breach of the Agreement.

5.     Beximco has also tried to hide the extent of its contractual violations.  In violation of the Agreement, Beximco has never provided Indus with its monthly sales reports, and it has failed to allow Indus to audit Beximco's accounting records.  On information and belief, Beximco, operating under the complete control of its Chairman and executives, has also hatched a scheme to sell products to customers in the United States and Canada through affiliates and other third parties without Indus's involvement, including through the generation of fraudulent invoices reflecting false unit prices, thereby obscuring the full extent of Beximco's sales on which it owes commissions and violating the Agreement.  Indus is further informed and believes that these third parties, with full knowledge of the Agreement, have cooperated with Beximco to facilitate, induce, and procure Beximco's breaches of the Agreement.  Put differently, these third parties have acted

willfully, intentionally, fraudulently, with wanton negligence, or with conscious disregard of Indus's rights under the Agreement.

6.      Hoping to salvage the parties' relationship, Indus has repeatedly encouraged Beximco to cure its material breaches of the Agreement.  Yet Beximco has obstinately refused. Indeed, Beximco has since made clear that it wishes to terminate the Agreement and walk away from the parties' partnership without paying the millions in commissions it owes.  In other words, now that Indus has helped Beximco establish its presence in the United States and Canada, Beximco wants to abscond with the fruits of Indus's considerable efforts and give Indus almost nothing in return.

7.      That is not how contracts work.  Indus lived up to its obligations under the Agreement; Beximco did not.  Beximco's continual and ongoing material breaches of the Agreement have injured Indus by, among other things, depriving it of commission payments to which it is entitled, precluding it from developing further relationships with customers in the United States and Canada, and preventing it from continuing to earn commissions through the current term of the Agreement.  Indus is entitled to compensation for all these injuries.  Indus thus files this suit to remedy Defendants' misconduct, obtain appropriate redress, and hold Defendants accountable for their misconduct.

## THE PARTIES

8.      Plaintiff Indus Apparel, USA Inc. is a corporation organized under the laws of the State of New York, with its principal place of business located at 1441 Broadway, Suite 2402, New York, New York 10018.

9.      On information and belief, Defendant Bangladesh Export Import Company Ltd. is a company organized under the laws of Bangladesh, with its principal place of business located at

- 4 -

House #17, Road No. 2, Dhanmondi R. A., Dhaka-1205, Bangladesh.  On information and belief, Beximco also has an office located in New York City, New York.

10.    Defendant Ahmed Sohail Fasihur Rahman ("Mr. A.S.F. Rahman") is the co-founder and Chairman of BEXIMCO Group.  On information and belief, Mr. A.S.F. Rahman is a citizen of Bangladesh currently living in exile in London, England.

11.    Defendant Ahmed Shahryar Rahman ("Mr. Shahryar Rahman") is currently the Chief Executive Officer and President of the Textile and Apparel Division of Beximco and co-owner of RR Global Trading FZE.  On information and belief, Mr. Shahryar Rahman is a citizen of the United Kingdom and currently living in London, England.

12.    Defendant Ahmed Shayan Rahman ("Mr. Shayan Rahman") is currently a co-owner of RR Global Trading FZE.  On information and belief Mr. Shayan Rahman is a citizen of Bangladesh and/or the United Kingdom and is currently living in Singapore.

13.    On information and belief, Defendant Beximco Fashions Limited is a company organized under the laws of Bangladesh, with its principal place of business located at Plot No. 24 (New), 17 (Old), Bir Uttam M. Rob Sarak, Road No. 2, Dhanmondi, Dhaka-1205, Bangladesh.

14.    On information and belief, Defendant Bextex Garments Limited is a company organized under the laws of Bangladesh, with its principal place of business located at Plot No. 24 (New), 17 (Old), Bir Uttam M. Rob Sarak, Road No. 2, Dhanmondi, Dhaka-1205, Bangladesh.

15.    On information and belief, Defendant Crescent Fashion & Design Ltd. is a company organized under the laws of Bangladesh, with its principal place of business located at Plot No. 24 (New), 17 (Old), Bir Uttam M. Rob Sarak, Road No. 2, Dhanmondi, Dhaka-1205, Bangladesh.

16.     On information and belief, Defendant Escorp Apparels Limited is a company organized under the laws of Bangladesh, with its principal place of business located at Plot No. 24 (New), 17 (Old), Bir Uttam M. Rob Sarak, Road No. 2, Dhanmondi, Dhaka-1205, Bangladesh.

17.     On information and belief, Defendant Esses Fashions Limited is a company organized under the laws of Bangladesh, with its principal place of business located at Plot No. 24 (New), 17 (Old), Bir Uttam M. Rob Sarak, Road No. 2, Dhanmondi, Dhaka-1205, Bangladesh.

18.     On information and belief, Defendant International Knitwear and Apparels Ltd. is a company organized under the laws of Bangladesh, with its principal place of business located at Plot No. 24 (New), 17 (Old), Bir Uttam M. Rob Sarak, Road No. 2, Dhanmondi, Dhaka-1205, Bangladesh.

19.     On information and belief, Defendant New Dacca Industries Ltd. is a company organized under the laws of Bangladesh, with its principal place of business located at Plot No. 24 (New), 17 (Old), Bir Uttam M. Rob Sarak, Road No. 2, Dhanmondi, Dhaka-1205, Bangladesh.

20.     On information and belief, Defendant RR Global Trading FZE is a company organized under the laws of the United Arab Emirates, with its principal place of business located at 62 & 63, Saif Suite, Building Z, PO Box: 121709, Sharjah Airport International Free Zone (SAIF Zone), Sharjah, UAE.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction because the parties are diverse and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332.

22.     The Court has personal jurisdiction over Beximco because it regularly conducts business within the State of New York and New York County.  The Agreement from which the

parties' dispute arises also provides that "the Parties submit to the jurisdiction of federal and state courts located in the State of New York."  Ex. A § 10.12.

23.    The Court has personal jurisdiction over Mr. A.S.F. Rahman because he directs Beximco's and its affiliates' activities described herein.  As Chairman of BEXIMCO Group, Mr. A.S.F. Rahman personally oversees and manages the directors and officers of BEXIMCO Group and Beximco and is the ultimate authority on and exercises full control and dominion over all matters and policies concerning and actions taken by the BEXIMCO Group, including Beximco's relationship with Indus and the operations of Beximco and its affiliates within the State of New York and New York County (as well as throughout the United States).  Mr. A.S.F. Rahman also traveled to the State of New York and New York County in February 2017 to meet with Indus on Beximco's behalf to negotiate the Beximco-Indus partnership and the terms of the Agreement. After the Agreement was signed, Mr. A.S.F. Rahman also traveled to the United States and met with one or more customers to discuss the sale of products governed by the Agreement.

24.    The Court has personal jurisdiction over Mr. Shahryar Rahman because he directs Beximco's and its affiliates' activities described herein.  As Chief Executive Officer of Beximco's Textiles and Apparel Division, Mr. Shahryar Rahman personally oversees and manages Beximco's relationship with Indus and the operations of Beximco and its affiliates within the State of New York and New York County (as well as throughout the United States).  After the Agreement was signed, Mr. Shahryar Rahman traveled to New York City and elsewhere in the United States on multiple occasions to attend meetings with customers that Indus solicited on behalf of Beximco in performance of the Agreement.  As co-owner of RR Global Trading FZE, Mr. Shahryar Rahman instructs and uses RR Global Trading FZE to facilitate or make sales of textile or apparel products into the United States on behalf of Beximco.

25.     The Court has personal jurisdiction over Mr. Shayan Rahman because, as co-owner of RR Global Trading FZE, Mr. Shayan Rahman instructs and uses RR Global Trading FZE to facilitate and make sales of textile or apparel products into the United States on behalf of Beximco.

26.     The Court has personal jurisdiction over Beximco Fashions Limited, Bextex Garments Limited, Crescent Fashion & Design Ltd., Escorp Apparels Limited, Esses Fashions Ltd., International Knitwear and Apparels Ltd, New Dacca Industries Ltd., and RR Global Trading FZE because they regularly conduct business within the State of New York and New York County. They have sold and shipped textile and apparel products to customers located in the State of New York, as well as to customers located throughout the United States.  As set forth further below, these parties are also alter egos of Beximco, and are thus bound by the forum selection clause in the Agreement.

27.     Venue is proper because many of the events giving rise to Indus's claims occurred and are occurring in this District, and because Defendants are subject to this Court's exercise of personal jurisdiction.  *See* 28 U.S.C. § 1391(b)–(c).

28.     Venue is also appropriate in this District based on the parties' agreement that "[t]he venue for deciding any dispute between the parties shall be federal and state courts located in the State of New York."  Ex. A § 10.12.

## **GENERAL ALLEGATIONS**

**A.**     **Indus is a Successful Product Design and Development Company Based in the United States, Whereas Beximco is a Foreign Textiles Manufacturer Who Struggled to Reliably Procure Customers in the United States and Canada.**

29.     Indus is a product design and product development services company that provides end-to-end solutions to fashion and apparel brands around the world.  Headquartered in New York

- 8 -

City, Indus operates across the globe, with design studios and development centers located in North America, the Middle East, North Africa, and Asia.

30.     Indus operates three primary divisions: manufacturing, innovation & services, and ventures.  Its manufacturing division is responsible for producing men's, women's, and children's apparel for distribution to retailers around the world.  Through its innovative use of technology and strategic acquisitions of factories in key locations, Indus can quickly shift production from one country to another based on anticipated market trends or conditions.  This flexibility and innovation have resulted in Indus serving as the leading supplier for some of the world's most renowned clothing brands.

31.     Indus's innovation & services division provides crucial product development and innovation services to fashion brands and their suppliers worldwide.  Other companies hire Indus to take advantage of this division's capabilities to, among other things, provide rapid sampling, analyses of value chains and related trends, product sourcing solutions, and compliance services.

32.     Finally, Indus's ventures division focuses on diversifying Indus's portfolio through strategic investments and partnerships in a variety of industries.  For example, through this division, Indus has invested in sustainable manufacturing, fashion brands, and private labels.  Indus leverages these investments and relationships to better serve its clients around the world.

33.     Beximco is a multinational conglomerate holding company that operates in a variety of industries and is located in Bangladesh.  As relevant here, Beximco manages South Asia's largest vertical textile operation, manufacturing textile and apparel products that are sold to distributors and retailers in various countries.  Beximco accomplishes these operations primarily through its Textile and Apparel Division.

34.    Beximco's Textile and Apparel Division is comprised of numerous factories, affiliates, and related entities all under Beximco's common ownership and/or control.  Such entities include, but are not limited to: Crescent Fashion & Design Ltd., Beximco Fashions Limited, Bextex Garments Limited, Escorp Apparels Limited, Esses Fashions Ltd., International Knitwear and Apparels Ltd., New Dacca Industries Ltd., RR Global Holdings Ltd., and RR Global Trading FZE.  At all relevant times, Beximco treated all such entities as its alter egos.  For instance, on information and belief, Syed Naved Husain—who was the Chief Executive Officer of Beximco's Textile and Apparel Division until a few years ago—directed the operations of these entities, had the authority to (and did) bind them to contractual obligations, oversaw the individuals employed by these entities, and otherwise controlled their activities.  On information and belief, Mr. Shahryar Rahman, the current Chief Executive Officer of Beximco's Textile and Apparel Division, exercises that same level of authority and control over the entities within the Division. Mr. Shahryar Rahman reports only to Mr. A.S.F. Rahman, the Chairman of BEXIMCO Group and Mr. Shahryar Rahman's father, who exercises absolute authority, dominion, and control over his son and Beximco's Textile and Apparel Division.

35.    On information and belief, Beximco also does not respect these affiliated entities' corporate forms or otherwise treat them as entities separate from Beximco itself.  For instance, Beximco classifies transactions between Beximco and these affiliated entities as "intercompany" transactions.  Beximco treats its own finances and those of these affiliated entities as fungible. When Beximco has a financial shortfall, it can freely take money from one of these affiliates to address that shortfall.  Similarly, when one of the affiliates suffers a financial shortfall, that affiliate can freely take money from Beximco or from one of the other affiliates to address the issue.

36.     Beximco even presents these affiliates to third parties as merely Beximco itself, rather than separate legal entities.  For example, Beximco regularly touts to potential customers that Beximco is a vertically integrated entity, with capabilities to manufacture, export, and ship both textile and apparel products without the need for a third-party middleman.  Moreover, even though the Beximco affiliates are the entities that actually manufacture garments, Beximco's sales pitches to customers refer only to "Beximco," and not the names of the affiliates.  In short, these affiliated entities—nearly all of which are physically located within Beximco Industrial Park in Bangladesh—are Beximco's alter egos.  Beximco treats them and presents them to others as mere extensions of Beximco itself.

37.     Prior to Beximco's partnership with Indus, Beximco struggled to develop business in the United States and Canada.  Beximco lacked the resources and experience needed to reliably procure new customers and establish or sustain productive relationships with key decision makers of those customers.  These problems were compounded by Beximco's internal deficiencies, including a lack of coordination between various departments involved in the manufacturing process and a failure to establish a person or department who would manage customer orders from beginning to end.  Those shortcomings, in turn, resulted in consistent delays of Beximco's order fulfillment, significant gaps in communications with customers, and ultimately a tarnished business reputation.  Indeed, as of early 2017, Beximco's only existing customer located in the United States or Canada was the clothing company Phillip Van Heusen.

38.     Given Beximco's significant and repeated shortcomings preventing it from reliably developing business in the United States and Canada, Beximco approached Indus for help, recognizing that a partnership with Indus presented a valuable opportunity.  Not only does Indus have good relationships with numerous apparel companies and customers throughout the United

States and Canada, it also has expertise in operations, marketing, compliance, and similar areas that are well-suited to help Beximco's business succeed in North America. Indus agreed to help Beximco, in exchange for appropriate compensation and exclusivity.

**B.    The Parties Execute the Sales Agency Agreement Appointing Indus as Beximco's Exclusive Sales Representative Entitled to Regular Commission Payments**

39.    After almost six months of negotiations and the exchange of multiple draft agreements, the parties formalized their business relationship by entering into the Sales Agency Agreement on May 12, 2017. Ex. A at 1. The Agreement is comprehensive and sets forth the terms that govern Beximco's dealings with Indus and with customers located in the United States and Canada.

40.    The primary bargain struck in the Agreement relates to Beximco's appointment of Indus as its sales representative. As Beximco's sales representative, Indus agreed to invest significant resources to develop Beximco's business in the United States and Canada. For example, Indus agreed to, among other things, "initiate contact with North American brands and retailers" for Beximco, "set up meetings" with customers, "manage the sales process" for Beximco, "manage all account processes and relationships," "employ and dedicate necessary resources/expertise and sales, design, marketing, administrative and logistical support resources," and "promote the sale of the Products[1] in the Territory[2]." Ex. A §§ 5.1.2–5.1.6, 5.3.

41.    In exchange for Indus's considerable effort as Beximco's sales representative, Beximco agreed to compensate Indus in primarily two ways. *First*, Beximco agreed that Indus

---

[1] The term "Products" is defined in the Agreement as "textile and apparel product manufactured or produced by [Beximco] and/or its affiliated entities." Ex. A § 1.1.

[2] The term "Territory" is defined in the Agreement as "the United States of America and Canada." Ex. A § 1.2.

would be Beximco's "*exclusive* sales representative for the Products in the Territory (meaning, for the avoidance of doubt, that [Beximco] or its affiliates will not directly or indirectly make sales into the Territory except through [Indus]." Ex. A § 2.1 (emphasis added).  This exclusivity was crucial to Indus.  With Indus as its sales representative, Beximco would have access to Indus's superior expertise, sales teams, and customer relationships developed over decades.  Indus thus needed assurances that Beximco would not take Indus's valuable resources, or circumvent Indus altogether by working with one of Indus's competitors or with customers directly, and thus damage Indus's ability to conduct its business.  That Indus would be Beximco's "exclusive" sales representative provided that assurance.

43.    *Second*, Beximco agreed to pay Indus commissions on sales of Beximco's products. Specifically, the Agreement obligates Beximco to pay Indus "a commission … of five percent (5%) on the net amount received by [Beximco] from the sales of all Products ordered, delivered or sold in the Territory." Ex. A § 3.1.[3]  Consistent with the exclusivity provision detailed above, Beximco's obligation to pay commissions applies to "all orders to the Territory …, whether or not such orders were solicited by [Indus]." Ex. A § 3.2.  And, as described above, the Agreement prohibits both Beximco and any of its affiliates from selling products to the Territory without Indus's involvement.  Ex. A § 2.1.

43.    Although Indus's and Beximco's relationship relates primarily to the United States and Canada, the Agreement obligates Beximco to pay commissions for some foreign sales as well. In particular, Beximco must pay "a commission not to exceed five percent (5%) on the net amount received by" Beximco for any sales "outside the Territory to Lacoste, Uniqlo, H&M and/or other

---

[3] The only exception to Beximco's obligation to pay commissions is that Beximco need not pay commissions on orders by Phillip Van Heusen—Beximco's only existing North American customer at the time the Agreement was executed.  Ex. A § 3.1; *id.* at 13.

buyers approved by" Beximco, provided Indus "actively solicits and markets to [such] customers outside the Territory." Ex. A § 4.7.

44.    Beximco is also obligated to pay Indus all commissions promptly. Indus is deemed to have "earned" its commission "for a given order … when the Products have shipped" and Beximco "has received payment for the Products," with the commission "due and payable thirty (30) days after the end of the calendar month in which [Beximco] receives payment from such order." Ex. A § 3.4.

45.    The Agreement creates several mechanisms to ensure Beximco complies with its obligation to timely pay commissions to Indus. For instance, the Agreement requires Beximco to provide "monthly statements of the commissions due and payable to" Indus, "with reference to the specific orders on invoices on which the commissions are being paid." Ex. A § 3.6; *see also id.* § 6.1.4 (requiring Beximco to "provide [Indus] with monthly reporting detail orders that have been placed with the following information: Customer, product info (style, fabric, finish, etc.), costing and delivery"). Indus was also given the contractual "right" to engage "independent auditors to inspect" Beximco's "relevant accounting records to verify the accuracy of Commissions paid by" Beximco under the Agreement once per year. Ex. A § 3.7.

46.    Like the exclusivity provision, the Agreement's provisions relating to Beximco's payment of commissions to Indus were essential to providing Indus with adequate compensation in exchange for the significant resources Indus planned to invest. Indeed, the parties anticipated that Beximco's business in the United States and Canada would grow from tens of millions to hundreds of millions of dollars in sales every year due to Indus's expertise and efforts, which would require Indus to consistently allocate resources to promote Beximco's products. It was thus

imperative that Indus regularly receive commission payments from Beximco as a return on Indus's efforts.

47.     Beximco and Indus agreed that the initial term of the Agreement would last for five years, or until November 13, 2021.  Ex. A § 9.1.  After that, the Agreement would be "renewed and extended automatically for additional successive five (5) year terms under the same terms and conditions," unless one party "provides written notice 180 days prior to the natural expiration" of the term that the Agreement would not be renewed.  Ex. A § 9.1.

48.     Finally, the Agreement established strict requirements for early termination of the Agreement by Beximco.  The Agreement is not terminable at will.  Rather, Beximco can terminate the Agreement "for cause" only if Indus (a) "fails (except for reasons outside its control) to meet the minimum performance standards specified in Section 5.2 of this Agreement," (b) "becomes insolvent or bankrupt," (c) "fails to cure any breach of a material covenant, commitment or obligation under this Agreement, within 45 days after receipt of written notice specifically setting forth the breach," or (d) "is convicted or pleads to a crime or an act of fraud that materially impacts on its performance or its fiduciary duties."  Ex. A § 9.2.

49.     Even if it is terminated, the Agreement imposes several post-termination obligations upon Beximco.   Among other things, Beximco must "[p]ay any unpaid Commission[s]" on earlier orders and "continue to pay commissions … with respect to sales made to such customers that were procured by [Indus] during the term of this Agreement for a period of five (5) years from such termination."  Ex. A §§ 9.5.3, 9.5.5.  Beximco is also prohibited from "do[ing] anything that will prejudice the reputation of [Indus] with any brand/retail accounts."  Ex. A § 9.5.2.

**C.** **Indus Fulfills Its Obligation to Serve as Beximco's Sales Representative, but Beximco Materially Breaches the Agreement**

50.    Following execution of the Agreement, Indus immediately began fulfilling its obligations as Beximco's sales representative.  For example, Indus conducted market research for Beximco at various U.S. retailers (including Target, Banana Republic, JCPenney, Men's Wearhouse, Brooks Brothers, and others), created presentations for Beximco documenting current industry trends in apparel, identified market opportunities that Beximco could exploit, and advised Beximco on operational strategy.  Indus set up meetings between Beximco and prominent retailers less than one year after the Agreement was signed.  Indus even allocated several of its employees— Muhammad Rafhan, Tariq Saher, Charles Schwarze, John Marquez, and Bilal Shafi Ghauri—to working nearly full-time on developing Beximco's business in the United States and Canada pursuant to the Agreement.

51.    Within months of the execution of the Agreement, Indus procured opportunities for potential business relationships for Beximco that were worth hundreds of millions of dollars.  Beximco, however, squandered those opportunities, including because Beximco repeatedly offered uncompetitive pricing, provided poor-quality samples to prospective customers, failed to communicate promptly or effectively, and lacked competent coordination within its various business units.  Examples of Beximco's failure to capitalize on the valuable opportunities procured by Indus include:

 a.    Less than one month after executing the Agreement, Indus secured a meeting with Walmart USA, a retailer that would likely have generated at least $100 million to $200 million in sales for Beximco.  Securing this account depended in large part on Beximco's performance with Walmart Mexico.  Poor communication and lack of

coordination by Beximco, including its inability to ship products on time, led Beximco to lose the Walmart Mexico account.  Once that occurred, Walmart USA refused to do business with Beximco.

b.  Indus procured opportunities for Beximco to establish relationships with premium brands like Guess, which would build Beximco's portfolio and enhance Beximco's reputation with other retailers.  Once again, Beximco's poor communication with the retailer and delayed shipments resulted in the loss of these opportunities.

c.  In October 2017, Indus secured a lucrative opportunity for Beximco to sell products to Haddad Brands, a licensee and distributor for several retailers, including Levi Strauss & Co.  A business relationship with Haddad represented millions of dollars in potential sales and a possibility that Beximco could eventually work with Levi's directly.  This never materialized because Beximco failed to satisfy Haddad's compliance requirements, was generally unresponsive, and lacked coordination.

d.  Before executing the Agreement, Indus had a preexisting relationship with Puma, another prominent retailer.  After the Agreement was signed, Indus persuaded Puma to meet with Beximco to consider adding Beximco as a supplier, which could generate tens of millions of dollars annually.  Beximco failed to offer competitive pricing, resulting in the loss of this opportunity.

e.  Indus arranged a meeting with Suburbia, who could easily have generated between $10 million and $20 million in sales within the first year of establishing a relationship with Beximco.  Yet Beximco failed to prepare for the meeting and was forced to withdraw from participating in the meeting shortly before the meeting

- 17 -

was to occur, significantly damaging Beximco's reputation and leading to loss of this opportunity.

f.   Indus procured an opportunity with Lacoste, a global retailer with a significant presence in the United States and Canada.  But Beximco provided poor-quality samples, so Lacoste declined any business with Beximco.  Had Beximco not bungled this relationship, Indus expected that this account would generate at least $15 million annually.

g.   Indus also heard from Jordache Enterprises, Inc., another prominent retailer, that it would not do business with Beximco because of Beximco's inability to provide competitive pricing for its textile and apparel products.

52.   Beyond procuring opportunities for Beximco to establish relationships with numerous customers, Indus also worked tirelessly to build Beximco's brand profile within the United States and Canada.  For example, Indus devoted substantial effort to help Beximco establish a "smart lab" in New York.  This smart lab would employ cutting-edge technology to manufacture denim products in a sustainable way by reducing the pollution that often accompanies the production of such products.  The smart lab would also provide Beximco's customers with the unique experience of testing new finishing treatments on garments and being directly involved in the manufacturing process.  To bring this smart lab to fruition, Indus persuaded DU/ER, a well-established Canadian retailer with a reputation for providing ethically produced and sustainable clothing, to partner with Beximco and help finance the project.  Indus also scouted potential locations for the smart lab, eventually securing an extremely desirable location in SoHo, a New York neighborhood filled with high-end retailers that were within Beximco's target demographic.  Unfortunately, the smart lab was never created because Beximco once again failed to capitalize on

- 18 -

the opportunity.  Had Beximco done so, this smart lab could have significantly boosted Beximco's reputation in the United States and Canada and led to many more sales of Beximco's products to a variety of retailers.

53.      In short, Indus's monumental efforts to fulfill its commitment to serve as Beximco's sales representative were consistently met with Beximco's incompetence.  Indeed, Beximco's poor communication with customers, inability to ship products on time, provision of low-quality samples, inability to provide competitive pricing, and lack of preparation for meetings violated Beximco's obligations.  Ex. A § 6.1.  This led to the loss of hundreds of millions of dollars in potential sales under the Agreement.

54.      In addition to Beximco's repeated failures to capitalize on opportunities procured by Indus, Beximco repeatedly failed to comply with its contractual obligations to Indus, thereby materially breaching the Agreement in multiple ways.  *First*, Beximco did not send (and to this day, has never sent) Indus a "monthly statement[] of the commissions due and payable … with reference to the specific orders on invoices on which the commissions are being paid."  Ex. A § 3.6; *see also id.* § 6.1.4.  Indus has requested these monthly statements on several occasions, but Beximco has never responded or complied.  By depriving Indus of this information, Beximco has made it impossible for Indus to determine the full extent of Beximco's sales into the United States and Canada since the Agreement's inception and calculate the commissions Beximco owes to Indus on those sales.  On information and belief, Beximco has intentionally withheld these monthly statements to prevent Indus from collecting the full commissions Beximco owes under the Agreement.

55.      *Second*, even without the detailed monthly sales information Beximco was obligated to provide, it is plain that Beximco has failed to adhere to the Agreement's requirement

that Beximco pay Indus a commission of five percent on all sales to the United States and Canada. Beximco's sales in the months following execution of the Agreement totaled millions of dollars. Indeed, on information and belief, between May 12, 2017 (the date of the Agreement) and November 29, 2023, Beximco and its related entities sold textile and apparel products into the United States and Canada that generated hundreds of millions of dollars in net sales. Since November 29, 2023, Beximco and its related entities have continued to sell textile and apparel products to customers located in the United States and Canada. Indus suspects that these more recent sales generated additional tens of millions of dollars in net sales.

56.     Under the Agreement, Beximco was obligated to pay Indus a five percent commission on all these sales within 30 days after "the end of the calendar month in which [Beximco] receives payment" for each order. Ex. A § 3.4. Beximco has never complied with that obligation. Beyond two insubstantial payments from one of Beximco's affiliates totaling less than $220,000 in 2021, Beximco has not paid any commissions since signing the Agreement. As a result, Beximco has deprived Indus of more than $15 million in commission payments. Each and every failure by Beximco to timely pay the commissions owed on each individual order constitutes a material breach of its obligations under the Agreement.

57.     To be clear, the amounts calculated above almost certainly understate the true extent of Beximco's sales and owed commissions. As already explained, Beximco has not provided Indus with monthly statements detailing all sales Beximco has made to customers located in the United States and Canada. For that reason, the limited information Indus has regarding the amount of Beximco's sales (including the information Indus has received from Beximco during discovery in this litigation) is likely incomplete and underreports the total sales of textile and apparel products that Beximco has made in the United States and Canada, including sales made

- 20 -

through Beximco affiliates and business partners.  All such sales are also subject to the Agreement's provisions.  Further, as explained in more detail below, Indus is informed and believes that Beximco regularly engages in a scheme by which Beximco invoices its products destined for North America at an inflated price to its overseas affiliates and business partners, who then sell the products to customers in the United States and Canada at a lower invoiced price, obscuring the true value of Beximco's sales.  Accordingly, Indus is confident that Beximco's true sales—and the commissions on those sales it owes to Indus—far exceed the amounts estimated above.

58.     *Third*, Beximco has failed to submit to an independent audit of its accounting records.  Indus has consistently sought to discuss with Beximco its ongoing failure to pay owed commission payments.  Indeed, Indus has repeatedly raised Beximco's outstanding commission balance with Beximco's key personnel—including with Mr. Syed Naved Husain and Mr. A.S.F. Rahman—since the Agreement's inception, requesting that Beximco immediately pay the balance it owes.  Beximco has repeatedly failed to comply.

59.     As a result, on April 22, 2022, Indus tried to exercise its contractual rights and demanded that, pursuant to Section 3.7 of the Agreement, Beximco permit independent auditors to review Beximco's accounting records to verify the amount of Beximco's total sales and the commissions it owes on those sales.  A copy of Indus's inspection demand is attached hereto as **Exhibit B**.

60.     In yet another direct breach of the Agreement, Beximco failed to allow the audit. In doing so, Beximco has obstructed Indus from obtaining information about Beximco's sales and the commissions Beximco owes to Indus on those sales.  Beximco has no legitimate basis on which to deny Indus's inspection demand.

61.     At bottom, Indus is informed and believes that Beximco has failed to comply with its contractual obligations by deliberately concealing its sales information from Indus, precluding Indus from collecting all owed commissions, and depriving Indus of the fruits of the bargain struck in the Agreement, all while continuing to profit off the substantial effort Indus exerted to develop Beximco's business in the United States and Canada.

**D.      Beximco Violates the Agreement's Exclusivity Provision with the Knowing Cooperation of its Alter Ego Affiliates**

62.     Simultaneous with Beximco's failures to provide Indus with monthly sales reports, timely pay commissions, and comply with Indus's inspection demand, Beximco repeatedly breached another material provision of the Agreement: its exclusivity provision.  As described above, under the Agreement, Indus was to be Beximco's "exclusive sales representative" in the United States and Canada, which meant that neither Beximco "[n]or its affiliates" could "directly or indirectly make sales into the Territory except through [Indus]."  Ex. A § 2.1.

63.     Beximco has routinely ignored that contractual prohibition.  On information and belief, since executing the Agreement, under the direction and control of Messrs. Shahryar Rahman and A.S.F. Rahman, Beximco has sold and delivered hundreds of millions of dollars of products to customers located in the United States and Canada, including but not limited to Hanes, Michael Kors, Amazon Fashion, Land's End, Tahari, Tailor Vintage, Centric Brands, Thinking Global, Li & Fung, Mighty Hurricane Holdings Inc., 5 Star Apparels Inc., and Centric Denim USA LLC.  Contrary to its obligations under the Agreement, Beximco made these sales without Indus's involvement and without paying Indus any commissions.

64.     Not only has Beximco itself made unauthorized sales to customers in the United States and Canada, but it has also directly and indirectly sold products to customers in the United States and Canada through its affiliates or business partners.  Indus is informed and believes that

Beximco has accomplished such sales, under the direction and control of Messrs. Shahryar Rahman and A.S.F. Rahman, through numerous alter ego affiliates or partners, including but not limited to RR Global Trading FZE, RR Global International (HK) Limited, Esses Fashions Limited, International Knitwear & Apparels Limited, Crescent Fashion & Design Limited, Styletex Apparel FZE, New Dacca Industries Limited, Beximco Fashions Limited, and Escorp Apparels Limited.  Each sale made by Beximco or any of its affiliates, directly or indirectly, to customers located in the United States and Canada constitutes an independent breach of the Agreement.

65.    Further, Indus is informed and believes that each of Beximco's affiliates and business partners who have sold Beximco's products to customers in the United States and Canada did so with full knowledge of the Agreement and Beximco's contractual obligation to use Indus as its "exclusive sales representative" for such sales.  On information and belief, these affiliates and business partners have intentionally induced, caused, facilitated, and procured Beximco's ongoing breaches of the Agreement, thereby disrupting Indus's contractual relationship with Beximco and depriving Indus of the compensation to which it is entitled.

66.    On information and belief, Messrs. Shahryar Rahman and Shayan Rahman, as owners of RR Global Trading FZE, have used, authorized the use of, and instructed others to use RR Global Trading FZE to make or facilitate sales of textile and apparel products on behalf of Beximco into the United States and Canada.  Indus believes that each of Messrs. Shahryar Rahman and Shayan Rahman are aware of the Agreement and Beximco's contractual obligation to use Indus as its "exclusive sales representative" for such sales.  Indus further believes that Beximco's direct or indirect use of RR Global Trading FZE to complete or facilitate sales of apparel or textile products into the United States or Canada, which Messrs. Shahryar Rahman and Shayan Rahman

directed or authorized, was motivated in part by an attempt to circumvent Beximco's exclusivity obligations in the Agreement. On information and belief, Messrs. Shahryar Rahman and Shayan Rahman have intentionally induced, caused, facilitated, and procured Beximco's ongoing breaches of the Agreement, thereby disrupting Indus's contractual relationship with Beximco and depriving Indus of the compensation to which it is entitled.

67.    As explained earlier, Beximco has long withheld its complete sales information from Indus in violation of the Agreement. Until recently, Indus was thus unaware that Beximco has been selling millions of dollars of products to customers located in the United States and Canada behind Indus's back through an array of business partners and affiliates. Indus only discovered this misconduct upon reviewing recent import data and third-party reports demonstrating that Beximco's affiliates had been importing millions of dollars' worth of Beximco's products into the United States without Indus's involvement. Indeed, Indus is still unaware of the full extent of Beximco's and its affiliates' direct and indirect sales to customers in the United States and Canada. Given Beximco's failure to comply with its obligation to disclose its sales information, Indus has been forced to resort to litigation to extract that information through discovery. Indus is confident that Beximco's sales data will reveal the existence of unauthorized sales to many more North American customers, through additional Beximco affiliates or business partners, that Beximco has failed to report to Indus or pay owed commissions.

**E.    When Indus Raises Issues with Beximco's Breaches of the Agreement, Beximco Purports to Terminate the Agreement**

68.    Since executing the Agreement, Indus has consistently tried to address the defects in Beximco's performance under the Agreement directly with Beximco. On numerous occasions, Indus's executive management contacted Beximco's executive management, pleading that

Beximco immediately stop violating the Agreement, comply with its obligations, and transfer the compensation due to Indus under the Agreement.

69.     Rather than take responsibility for its actions, Beximco regularly resorted to obfuscation.  Beximco routinely strung Indus along with promises of forthcoming commission payments (while trying to negotiate down the amount Beximco owed under the Agreement), expansion of Beximco's business through Indus, and similar promises of compliance with the Agreement.  Indus was willing to work in good faith with Beximco to resolve these issues.  Yet none of Beximco's promises materialized.

70.     In early 2022, Beximco's true purpose soon became clear: it wanted to terminate the Agreement, escape liability for its past violations, and pay an insubstantial sum to make its problems go away.  The problem for Beximco was that its opportunity to properly terminate the Agreement had already passed.  As explained earlier, the initial term of the Agreement was for five years, or until May 12, 2022.  Unless either party gave written notice at least 180 days before that date (*i.e.*, by November 13, 2021), the Agreement would "be renewed and extended automatically for [an] additional successive five (5) year term[] under the same terms and conditions." Ex. A § 9.1.  Beximco never gave any such written notice.  As a result, the Agreement had been automatically renewed and extended to May 12, 2027, so Beximco remained bound by its contractual obligations under the Agreement.

71.     Beximco thus hatched a plan to try to terminate the Agreement outside of the Agreement's termination provisions.  On or around February 20, 2022, Syed Naved Husain—Beximco's Textile and Apparel Division CEO and Group Director—sent Indus a draft "Termination and Release Agreement."  Under this draft agreement, the parties would "mutually terminate" the Agreement, and Indus would "release" Beximco "of all the obligations accrued or

to be accrued" under the Agreement.  Despite owing millions of dollars in unpaid commissions to Indus, Beximco proposed paying a nominal sum of $550,000.  In other words, Beximco was trying to starve Indus of the millions of dollars in commission payments Beximco owed under the Agreement, while dangling the prospect of a $550,000 payment, to try to force Indus to agree to a mutual termination.

72.    Indus rejected this proposal.  Indus's CEO—Abid Hafeez—told Mr. Husain that Beximco's draft agreement was "unacceptable and rejected," and made clear that "the only agreement that is valid is the 12th May 2017 agreement negotiated and signed by both parties," *i.e.*, the Agreement.  Indus was entitled to millions of dollars in unpaid commissions and expected to earn millions of dollars in additional commissions from sales made through the current term of the Agreement (*i.e.*, through May 12, 2027).  Beximco's attempt to strong-arm Indus into a mutual termination of the Agreement and a release of all of Beximco's liabilities to Indus failed.

73.    Undeterred, Beximco tried to terminate the Agreement again just a few months later.  In or around October 2022, Indus reiterated its demand that Beximco immediately stop violating the Agreement and pay all outstanding commissions owed.  In response to this demand, Beximco's counsel sent a letter to Indus that repeated Beximco's request that Indus sign the mutual termination agreement and offered to pay Indus $950,000 to walk away.  In that letter, Beximco purported to unilaterally terminate the Agreement, stating: "Beximco by this letter notifies you that the 2017 Agency Agreement is terminated with immediate effect for Indus's failure to meet the minimum standard for satisfactory performance."  Beximco provided no further information to justify this supposed termination.

74.    This second attempt to terminate the Agreement was ineffective.  As set forth above, the Agreement can only be terminated "for cause" before expiration of the current five-year

term if specific conditions are met. The relevant condition here is that Indus "fail[] (except for reasons outside its control) to meet the minimum performance standards specified in Section 5.2 of th[e] Agreement." Ex. A § 9.2.1.

75.     That condition never occurred. Before its counsel's letter in October 2022, Beximco had never told Indus that Indus was supposedly failing to meet the Agreement's minimum performance standards. Indeed, even when Beximco tried to get Indus to sign the mutual termination agreement in February 2022, Beximco never mentioned Indus's alleged lack of minimum performance. It is thus clear that this basis for Beximco's supposed termination is contrived and an excuse manufactured to get Beximco out of its obligations under the Agreement.

76.     At any rate, any supposed failure by Indus to meet minimum performance standards would have resulted from "reasons outside its control"—namely, Beximco's deliberate breaches of the Agreement and inability to exercise even the most basic level of competence since the Agreement's inception. For example, despite its contractual obligation to "provide [Indus] with prices that are below or competitive with prevailing market prices," Ex. A § 6.1.2, Beximco regularly failed to do so, making it much more difficult to sell Beximco's products to customers. Similarly, Beximco routinely failed to meet compliance requirements for certain customers, provided low-quality samples to prospective customers, significantly delayed shipments of customer orders, and regularly remained unresponsive to customer inquiries.

77.     All these failings created a perception among major customers located in the United States and Canada that Beximco's products and services were inferior to those of its competitors. It is thus unsurprising that many of those customers chose to purchase products from Beximco's competitors instead. As a result, the fault for any shortfall in meeting the Agreement's

performance standards is Beximco's alone, not Indus's, which independently renders Beximco's purported termination of the Agreement ineffective.

78.    Because the Agreement has never been terminated pursuant to its provisions, its terms continue to govern the parties' relationship to this day.  Beximco is thus in continual and ongoing breach of the Agreement.

**F.    Beximco Engages in a Fraudulent Scheme Involving the Falsification of Invoices for Goods Sold to Customers in the United States and Canada**

79.    After Indus began investigating the extent of Beximco's breaches of the Agreement, Indus discovered that Beximco engages in a fraudulent invoicing scheme that consists of two primary steps.

80.    The first step of the fraudulent invoicing scheme occurs after a customer located in the United States or Canada places an order.  Once that happens, Beximco or one of its affiliates located in Bangladesh generates an invoice that reflects a unit price for the goods that far exceeds the unit price the customer is actually paying.  Rather than being billed to the customer, however, this initial invoice is billed to another of Beximco's overseas affiliated entities.

81.    The second step in Beximco's fraudulent invoicing scheme is that Beximco's overseas affiliate then generates a second invoice.  This second invoice is billed to the end customer and reflects a much lower unit price for the goods purchased than is reflected on the initial invoice billed to Beximco's overseas affiliate.

82.    To illustrate Beximco's fraudulent invoicing scheme, consider the following example.  On June 29, 2021, Crescent Fashion and Design Ltd.—a Beximco affiliate located in Beximco Industrial Park in Bangladesh—generated an invoice reflecting an order of 24,000 units of women's jeans by Mamiye Brothers, Inc., a customer located in the United States.  According to the invoice, the unit price for the goods was $10 per piece, resulting in a total invoiced amount

of $240,000. This invoice was billed to RR Global Trading FZE, an entity located in the United

Arab Emirates that is also affiliated with Beximco and owned by and subject to the control of

Messrs. Shahryar Rahman and Shayan Rahman. The following is an image of this invoice:



83. On the same day, June 29, 2021, a second invoice was generated by Styletex

Apparel FZE, an entity located in the United Arab Emirates that serves as a vendor for Beximco.

This second invoice reflects the same purchase order number, the same billing and lading number,

and the same customer. Rather than a unit price of $10, however, this invoice shows a unit price

of just $4.96 per piece, for a total invoiced amount of $119,040.  Unlike the first invoice, this

second invoice is billed to the customer—Mamiye Brothers Inc.  The following is an image of this

second invoice:

## STYLETEX APPAREL FZE
### 600 M2 WAREHOUSE T5-30, SAIF ZONE, SHARJAH, UAE
### COMMERCIAL INVOICE

| MANUFACTURER / SHIPPER : | BILL TO : | INVOICE NO.: | SAF/CFDL/0476/21 | DATE: | 29/06/2021 |
|---|---|---|---|---|---|
| CRESCENT FASHION AND DESIGN LTD | MAMIYE BROTHERS INC. | EXP NO    : | | DATE: | |
| Beximco Industrial Park | 1385 BROADWAY | Contract No.: | SAF/CFDL/001/2021 | DATE: | 02/05/2021 |
| Sarabo, Kashimpur, | 17TH FLOOR | BUYER BANK : | | | |
| Gazipur, Bangladesh | NEW YORK, NY 10018 | BANK OF AMERICA, | | | |
| CONSIGNEE / APPLICENT :- | | 1 FLEET WAY, SCRANTON PA 18507 | | | |
| MAMIYE BROTHERS INC. | | PHONE # 1-800-841-4000 | | | |
| 1385 BROADWAY | | SWIFT : BOFAUS3N | | | |
| 18TH FLOOR | | BENEFICIARY'S BANK : | | | |
| NEW YORK, NY 10018 | | ABUDHABI COMMERCIAL BANK | | | |
| 1ST NOTIFY PARTY :- | | 304 AL MAJAZ, SHARJAH, UAE | | | |
| EXPEDITORS INTERNATIONAL, | | Swift Code :    ADCBAEAAXXX   IBAN : AE480030011760626920002 | | | |
| 5757 W.CENTURY BLVD., 2ND FLOOR, LOS ANGELES, CA 90045, | | Account No.:    11760626920002 | | | |
| ATTN: JEANETTE JACOBA,TEL:310-343-6200 | | ORIGIN    : | BANGLADESH | | |
| ALSO NOTIFY PARTY :- | | PORT OF DISCHARGE : | LONG BEACH, CA, USA | | |
| MAMIYE BROTHERS INC,. | | FINAL DESTINATION : | LONG BEACH, CA, USA | | |
| 1385 BROADWAY, 18TH FLOOR, | | B/L NO. | WAC21070624 | | |
| NY, NY 10018 | | DATE    : | 02/08/2021 | | |
| PORT OF LOADING : | CHATTAGRAM, BANGLADESH | TERMS OF DELIVERY : | FOB BANGLADESH | | |
| CARRIAR    : | BY SEA | PAYMENT TERMS : | AT SIGHT | | |

| MARKS & NUMBER OF PKGS | DESCRIPTION OF GOODS | QUANTITY (PCS) | UNIT PRICE | US$ |
|---|---|---|---|---|
| MAMIYE BROTHERS, INC | WEARING APPAREL | | | |
| C/O MAMIYE GROUP LLC (51) | LADIES DENIM PANT. | | | |
| 13230 SAN BERNARDINO AVE | 72% COTTON 27% POLYESTER 1% SPANDEX | | | |
| FONTANA, CA 92335-5229 | PO#        STYLE# | | | |
| MADE IN BANGLADESH | 1079097    VBM00656X-Z303-R042-BANG | 24,000 PCS | 4.96  /PC | $ 119,040.00 |
| CARTON #    OF | | | | |
| STYLE# | | | | |
| MB PO# | | | | |
| SIZE | | | | |
| COLOR | | | | |
| QTY | | | | |
| CBM | | | | |
| GR. WT. | | | | |
| | H.S. CODE: 6204.62.8011 | | | |
| | TOTAL : | 24,000 PCS | | $  119,040.00 |

84.    On information and belief, Beximco engages in this fraudulent invoicing scheme

to, among other things, inflate its reported revenue, obtain financing worth hundreds of millions

of dollars from banks or other third parties, and enhance its reputation in Bangladesh and around

- 30 -

the world.  Indeed, as a publicly traded company in Bangladesh, Beximco and its executives are accountable to the Bangladeshi government, and its leadership is often affected by the outcome of political elections in that country.  As a result, it is important for Beximco to maintain a veneer of success in the eyes of the public by reporting as high revenues as possible.  This falsified invoicing practice furthers that objective.

85.    Beximco's fraudulent invoicing scheme also results in obscuring the actual amounts received by Beximco for sales of goods to customers located in the United States and Canada, thereby concealing the true amount of commissions Beximco owes to Indus under the Agreement.  It also prevented Indus from discovering Beximco's misconduct earlier and from understanding the full extent of Beximco's violations of the Agreement.

86.    Recent events and public disclosures have confirmed the existence of Beximco's fraudulent invoicing scheme.  For instance, on September 18, 2024, an article was released with the headline: "BEXIMCO laundered money through apparel export misinvoicing."[4]  The article documents that "17 companies of BEXIMCO Group siphoned off money to three countries by misinvoicing in apparel exports over the past 12 years," which allowed "BEXIMCO Group" to "launder[] the money through state-owned Janata Bank."  Critically, Beximco's laundering scheme was carried out through "Dubai-based RR Global"—the same Beximco affiliate that appears on the invoice depicted above and which is owned by and subject to the control of Messrs. Shahryar Rahman and Shayan Rahman.

87.    Multiple other news outlets have also reported on Beximco's fraudulent invoicing scheme in recent months.  Examples include the Dhaka Tribune ("CID starts investigation against

---

[4] *See BEXIMCO Laundered Money through Apparel Export Misinvoicing*, Prothom Alo English (Sept. 18, 2024), https://en.prothomalo.com/business/local/s4lx6b8qq2.

Beximco Group" under the "Money Laundering Act"),[5] the Daily Observer ("CID investigating money laundering charges against Beximco Group"),[6] The Finance Today ("CID launches probe into Beximco money laundering allegations"),[7] and Samoy Media ("Beximco laundered money: CID").[8]

88.     As many of those articles document, Bangladesh police's Criminal Investigation Department has opened an investigation into Beximco's fraudulent invoicing and money laundering scheme in Bangladesh, which has thus far uncovered evidence that Beximco's Chairman, Mr. A.S.F. Rahman, "used 17 Beximco-owned companies to export goods" without repatriating the proceeds, "indicating that the funds were illicitly transferred abroad."[9]  As part of that investigation, Beximco's Vice Chairman—Salman F. Rahman—has been arrested and is currently incarcerated in Bangladesh.  On information and belief, many of Beximco's other executives—including Mr. A.S.F. Rahman and Mr. Husain—have fled Bangladesh and are currently residing in other countries, likely to escape potential criminal investigation, arrest, and prosecution for their involvement in Beximco's fraudulent practices.

89.     Beximco's now well-documented fraudulent invoicing and money laundering scheme not only exposes it to criminal liability in Bangladesh, but also to civil liability here.  By

---

[5] *See CID Starts Investigation Against Beximco Group*, DhakaTribune (Sept. 1, 2024), https://www.dhakatribune.com/bangladesh/corruption/356916/cid-starts-investigation-against-beximco-group.

[6] *See CID Investigating Money Laundering Charges Against Beximco Group*, Daily Observer (Sept. 3, 2024), https://www.observerbd.com/news.php?id=488385.

[7] *See CID Launches Probe into Beximco Money Laundering Allegations*, Finance Today (Sept. 2, 2024), https://www.thefinancetoday.net/article/national/25779/CID-launches-probe-into-Beximco-money-laundering-allegations.

[8] *See Beximco Laundered Money: CID*, Somoy (Sept. 1, 2024), https://en.somoynews.tv/news/2024-09-01/LzU4ZUyt.

[9] *See, e.g.*, *Money Laundering: CID Files 17 Cases Against Salman F. Rahman, 27 Others*, DhakaTribune (Sept. 18, 2024), https://www.dhakatribune.com/bangladesh/dhaka/358815/cid-files-17-cases-against-salman-f-rahman-27.

engaging in this scheme, Beximco and its executives hid the true value of sales of textile and apparel products to the United States and Canada, depriving Indus of the full commission amounts that it is owed. Indus is entitled to remedy the flagrant violation of its rights resulting from these fraudulent invoicing practices.

### G.    Recent Discovery Reveals that Beximco and its Executives Defrauded Indus When Negotiating the Agreement

90.    Faced with the indisputable evidence of its repeated and material breaches of the Agreement, Beximco has fashioned a novel and self-serving interpretation of the Agreement during this litigation. As made clear during recent depositions of Beximco's executives, Beximco apparently intends to take the position that the Agreement did not require Beximco to pay Indus any commissions because Beximco itself does not manufacture or sell textile or apparel products, and thus Beximco itself receives no revenue from such sales. Instead, according to Beximco, those activities are conducted by Beximco's affiliates, who also receive all the associated revenue.

91.    Beximco never articulated such an interpretation before this litigation. Nor did Beximco's actions following execution of the Agreement reflect such an interpretation. For instance, the paltry commissions paid to Indus were paid—not by Beximco—but by one of Beximco's affiliates.

92.    Moreover, the facts plainly contradict Beximco's new theory. As explained earlier, all of Beximco's affiliates are alter egos of Beximco itself. They are directed and controlled by Beximco's executives, including Messrs. A.S.F. Rahman and Shahryar Rahman; they engage in "intercompany" transactions with Beximco; they are identified to third parties as "Beximco"; and they freely share their funds whenever Beximco deems necessary. When negotiating and after

- 33 -

executing the Agreement, Indus thus always understood and expected that it was entitled to commissions on all sales to the United States and Canada from Beximco or its affiliates.

93.     Regardless, even if Beximco's interpretation were correct and it owes no commissions on sales completed by its affiliates, then in the alternative, Beximco is liable for defrauding Indus.  In the fall of 2016, Beximco's then-current Chief Executive Officer of the Textile and Apparel Division—Mr. Syed Naved Husain—met with Indus's executives to discuss a potential partnership between Beximco and Indus.  During those discussions, Mr. Husain represented Beximco as a vertically integrated entity with capabilities spanning the garment manufacturing process, from spinning yarn and creating textile materials to converting those materials to finished garments.  At no point during that discussion did Mr. Husain tell Indus that Beximco accomplished these manufacturing processes through affiliated entities that were distinct from Beximco.  As a result, Indus's understanding from that initial meeting was that Beximco itself conducted these manufacturing activities.

94.     Beximco's Chairman perpetuated this fraud several months later.  In February of 2017, Mr. A.S.F. Rahman traveled to New York City to meet with representatives of Indus in Indus's office.  Mr. A.S.F. Rahman attended these meetings alone on behalf of Beximco.  During the meetings, the Parties discussed forming a sales agency agreement to memorialize their partnership, and Mr. A.S.F. Rahman represented to Indus that Beximco was a vertically integrated manufacturer and exporter of textiles and apparel with capabilities spanning the garment manufacturing process, from spinning yarn and creating textile materials to converting materials to finished garments, and that most of its facilities were located within Beximco Industrial Park—the principal place of business shared between Beximco and many of its affiliates. At no point during that discussion did Mr. A.S.F. Rahman tell Indus that Beximco performed these

6801275

manufacturing processes through affiliated entities that were distinct from Beximco. As a result, Indus's continued to believe that Beximco itself conducted these manufacturing activities. Throughout his discussions with Indus and the entirety of the Parties' dealings, Mr. A.S.F. Rahman represented Beximco's Textile and Apparel Division and all affiliates, entities, and alter egos included therein to Indus as a singular entity known as "Beximco," subject to Mr. A.S.F. Rahman's ultimate authority, control, and dominion.

95.    On information and belief, Mr. Husain and Mr. A.S.F. Rahman made these representations with the sole purpose of deceiving Indus by concealing the nature of the relationships between Beximco, Beximco's Textile and Apparel Division, and the alter ego affiliates that comprise Beximco's Textile and Apparel Division such that Indus would believe that work performed on behalf of any of Beximco's alter ego affiliates would constitute work performed on behalf of Beximco. Concealing the distinctions between Beximco and the alter ego affiliates comprising Beximco's Textile and Apparel Division provided Mr. A.S.F. Rahman and Beximco flexibility in the Parties' negotiations. Indeed, Mr. A.S.F. Rahman's misrepresentations enabled all of Beximco, including its alter ego affiliates comprising Beximco's Textile and Apparel Division, to benefit from Indus's obligations while exposing only Beximco Ltd., and not Beximco's alter ego affiliates, to Beximco's liabilities. That understanding formed the basis for Indus's negotiations of the Agreement with Beximco. Indeed, throughout those negotiations, Indus made clear that it expected to receive commissions on all sales of Beximco's products to customers located in the United States and Canada. Indus also made clear, and Mr. A.S.F. Rahman and Beximco repeatedly confirmed, its understanding that any revenue generated by such sales would go to Beximco.

96.     Neither Mr. A.S.F. Rahman nor Beximco ever disputed Indus's understanding or otherwise told Indus that its understanding was incorrect.  To the contrary, Beximco inserted provisions into the Agreement that suggested the opposite: that Beximco did receive the revenue generated by sales of textile and apparel products manufactured by its affiliates.  For example, section 4.4 required that "[a]ll orders obtained by [Indus] shall be subject to acceptance *by Company* [Beximco]," not an affiliate.  Ex. A, § 4.4.  Section 4.6 stated that "full responsibility for all collection" of accounts receivable "rests with Company [Beximco]," not an affiliate.  *Id.* § 4.6.  And Section 10.6 says that "Company [Beximco] owns *all right, title, and interest in the product lines* that include the Products."  *Id.* § 10.6 (emphasis added).  In short, Beximco never told Indus that Beximco does not receive revenue from sales made by its affiliates.  To the contrary, Beximco concealed that fact from Indus while knowing that Indus believed the opposite.

97.     Indus justifiably relied on and was harmed by Beximco's concealment and willful omission of this material fact.  Indus began acting as a sales agent on behalf of the entirety of Beximco's Textile and Apparel Division while expecting Beximco's obligations to be equally as broad.  Beximco received those benefits on behalf of its alter ego affiliates without protest but now seeks to evade the full extent of its obligations by relying on legal-fiction distinctions and misrepresentations to assert that Beximco's obligations under the Agreement do not apply to its alter ego affiliates.  Under the Agreement, Indus was expected to (and did) invest significant resources to promoting Beximco's products to customers in the United States and Canada and to supporting Beximco's sales processes.  In return for that investment and effort, Indus reasonably expected that it would be compensated for every sale to customers in the United States and Canada.  Indeed, as a result of Indus's efforts, Beximco and its affiliates have sold hundreds of millions of dollars' worth of textile and apparel products to those customers since the Agreement was signed.

But Beximco has paid almost no commissions to Indus in return, depriving Indus of millions of dollars in compensation.  Beximco's alternative interpretation of the Agreement that Indus was required to devote time and resources to promoting products on behalf of Beximco and its affiliates and yet receive almost no compensation in return—an interpretation Beximco concealed until this litigation—is absurd.

98.    Indus thus brings this lawsuit to vindicate its rights, hold Beximco and its executives accountable, and pursue all relief available to it.

## FIRST CAUSE OF ACTION

### Breach of Contract Under New York Law[10]

### (Against Beximco)

99.    Indus realleges and incorporates by reference each allegation contained in the paragraphs above as though fully set forth herein.

100.    Indus and Beximco entered into the Agreement on or around May 12, 2017.  Under the Agreement, Beximco was obligated to appoint Indus as its "exclusive sales representative" for sales to customers in the United States and Canada, refrain from making any direct or indirect sales to customers in the United States and Canada except through Indus, provide Indus with monthly statements detailing Beximco's sales, and pay Indus a commission of five percent on all sales to customers located in the United States and Canada within thirty days after the end of the calendar month in which Beximco received payment for each individual sale.  The Agreement also requires Beximco to permit Indus to initiate an audit of Beximco's accounting records to verify the accuracy of its sales data and the commissions it owes to Indus.

---

[10] Pursuant to Section 10.12 of the Agreement, the Agreement is "governed by and construed in accordance with New York law."  Ex. A § 10.12.

101.    Despite Indus's performance under the Agreement and good-faith efforts to facilitate Beximco's performance, Beximco blatantly breached the Agreement in multiple ways. *First*, Beximco has never provided Indus with a monthly statement detailing Beximco's sales. Every month that Beximco has failed to provide a statement constitutes a separate breach of the Agreement.  *Second*, Beximco has not timely paid the commissions it owes to Indus under the Agreement.  Every order on which Beximco fails to timely pay commissions to Indus constitutes a separate breach of the Agreement.  *Third*, Beximco failed to permit Indus to audit Beximco's accounting records, in direct violation of the Agreement.  *Fourth*, Beximco has routinely sold products to customers in the United States and Canada without Indus's involvement.  These sales have been made by both Beximco and its many affiliates, all of whom are Beximco's alter egos. Each such sale without Indus's involvement constitutes a separate breach of the Agreement.

102.    Beximco's repudiation of its contractual duties injured Indus.  Not only has Beximco deprived Indus of millions of dollars of commission payments to which Indus is entitled, but it has also damaged Indus's reputation and precluded Indus from realizing the value of relationships with customers to whom Beximco has sold product without Indus's involvement. Indus invested substantial resources to develop Beximco's business within the United States and Canada after executing the Agreement.  Beximco benefitted from that investment, but has failed to compensate Indus according to the Agreement.  Indus is thus entitled to compensation, plus interest, for all the injuries it has suffered resulting from Beximco's breaches of the Agreement, including compensation for injuries Indus will suffer given Beximco's apparent intention to continue to ignore its contractual obligations through the life of the Agreement.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing Under New York Law

### (Against Beximco)

103.    Indus realleges and incorporates by reference each allegation contained in the paragraphs above as though fully set forth herein.

104.    Indus and Beximco entered into the Agreement on or around May 12, 2017.  Under New York law, implied in every contract is a covenant of good faith and fair dealing, requiring each party to the contract to refrain from arbitrary or unreasonable conduct that has the effect of preventing the other party from receiving the fruits of the contract.

105.    Beximco breached the implied covenant of good faith and fair dealing by failing to meaningfully respond to Indus's requests for monthly sales data, commission payments, and similar information.  These repeated failures deprived Indus of the benefits it expected to receive under the Agreement.

106.    Beximco also breached the implied covenant of good faith and fair dealing by engaging in a fraudulent invoicing scheme.  Pursuant to that scheme, Beximco or its affiliates first generate an invoice reflecting an inflated unit price that is billed to one of Beximco's overseas affiliates or vendors.  A second invoice is then generated reflecting a lower invoiced price that is billed to the customer.  Indus is informed and believes that, by engaging in this scheme, Beximco is able to obscure the true value of its sales to customers in the United States and Canada, preventing Beximco from accurately estimating the commissions Beximco owes under the Agreement.

6801275

107.    Beximco further breached the implied covenant of good faith and fair dealing by purporting to arbitrarily terminate the Agreement on the contrived basis that Indus had allegedly failed to meet minimum performance standards.

108.    Finally, Beximco breached the implied covenant of good faith and fair dealing by unreasonably failing to meet compliance requirements for certain customers, providing low-quality samples to prospective customers, significantly delaying shipments of customer orders, regularly remaining unresponsive to customer inquiries, and ignoring Indus's advice.

109.    As a result of Beximco's actions, Beximco deprived Indus of the ability to further develop Beximco's business within the United States and Canada, and thereby earn additional commission income and establish fruitful relationships with additional customers.  Beximco's breaches also prevented Indus from realizing an adequate return on the significant investments Indus made to promote Beximco's products and improve Beximco's product line and business operations.  Indus is therefore entitled to compensation, plus interest, for the injuries caused by Beximco's arbitrary and unreasonable conduct.

### THIRD CAUSE OF ACTION

**Violation of New York Labor Law**

**(Against Beximco)**

110.    Indus realleges and incorporates by reference each allegation contained in the paragraphs above as though fully set forth herein.

111.    New York Labor Law sections 191-a, 191-b, and 191-c provide certain protections to independent contractor sales representatives located in New York.  Among other things, a sales representative who does not receive "timely payment of all earned commissions" according to a contract between the sales representative and its principal is entitled to recover "double damages,"

"an award of reasonable attorney's fees, court costs, and disbursements" from the principal.  N.Y. Lab. Law §§ 191-c(3), 191-b.

112.    Beximco and Indus entered into the Agreement on or around May 12, 2017.  Under the Agreement, Beximco appointed Indus as its "exclusive sales representative for the Products in the Territory (meaning, for the avoidance of doubt, that the Company or its affiliates will not directly or indirectly make sales into the Territory except through [Indus])."  Ex. A § 2.1.  The parties' relationship "is that of independent contractor."  Ex. A § 2.2.

113.    The Agreement obligated Beximco to pay Indus a commission "of five percent (5%) on the net amount received by [Beximco] from the sales of all Products ordered, delivered or sold in the Territory."  Ex. A § 3.1.  Indus is deemed to have "earned" its commission "when the Products have shipped" and Beximco "has received payment for the Products."  Ex. A § 3.4.  According to the Agreement, "[t]he Commission on a given order shall be due and payable thirty (30) days after the end of the calendar month in which [Beximco] receives payment from such order."  Ex. A § 3.4.

114.    Since entering the Agreement, Beximco has regularly failed to pay Indus the commissions it owes under the Agreement.  Indeed, the only commission payments Indus has ever received from Beximco were two insubstantial payments in 2021 totaling less than $220,000.  On information and belief, Beximco's total sales since the Agreement's inception to customers located in the United States and Canada have exceeded $86.5 million.  Beximco has thus failed to timely pay millions of dollars in commissions to Indus.

115.    Pursuant to New York Labor Law, Indus is entitled to recover double the amount of unpaid commissions from Beximco, as well as all attorney's fees, court costs, and other disbursements incurred by Indus to recover those unpaid commissions.

## FOURTH CAUSE OF ACTION

### Tortious Interference with Contract

**(Against Ahmed Sohail Fasihur Rahman, Ahmed Shahryar Rahman, Ahmed Shayan Rahman, Beximco Fashions Limited, Bextex Garments Limited, Crescent Fashion & Design Ltd., Escorp Apparels Limited, Esses Fashions Ltd., International Knitwear and Apparels Ltd., New Dacca Industries Ltd., and RR Global Trading FZE)**

116.    Indus realleges and incorporates by reference each allegation contained in the paragraphs above as though fully set forth herein.

117.    Beximco and Indus entered into the Agreement on or around May 12, 2017. Pursuant to the Agreement, Indus was to be Beximco's "exclusive sales representative" for sales of Beximco's products to customers in the United States and Canada. Ex. A § 2.1. The Agreement prohibits Beximco and "its affiliates" from "directly or indirectly mak[ing] sales into the Territory except through" Indus. Ex. A § 2.1. The Agreement further obligates Beximco to pay to Indus commissions on "all orders to the Territory" based on the "net sales amount received by [Beximco]." Ex. A § 3.2.

118.    As described above, Beximco has repeatedly breached the Agreement by, among other things, selling products to customers within the United States and Canada without Indus's involvement, selling products to customers within the United States and Canada through affiliates and business partners, and failing to timely pay commissions on every sale to customers within the United States and Canada. Those affiliates—specifically, Beximco Fashions Limited, Bextex Garments Limited, Crescent Fashion & Design Ltd., Escorp Apparels Limited, Esses Fashions Ltd., International Knitwear and Apparels Ltd., New Dacca Industries Ltd., and RR Global Trading FZE—are subject to the authority, dominion, and control of Messrs. A.S.F. Rahman, Shahryar Rahman, and Shayan Rahman and are Beximco's alter egos, and thus should be considered and treated as Beximco itself.

119.     Deposition testimony and discovery have thus far confirmed that Beximco and all of the alter ego affiliates in Beximco's Textile and Apparel Division are subject to the control, dominion, and authority of and are overseen and managed by a common Chief Executive Officer, currently Mr. Shahryar Rahman, who in turn must report to a single individual, Mr. A.S.F. Rahman, with the power to unilaterally overrule him on any matter relating to Beximco or its alter ego affiliates.   Similarly, discovery has confirmed that Messrs. Shahryar Rahman and Shayan Rahman own and control RR Global Trading FZE, which is one of the affiliated entities Beximco primarily relies upon to export textile and apparel products and perpetuate its money-laundering scheme.[11]   On information and belief, Messrs. Rahman have exercised their dominion, control, and authority over Beximco and its alter ego affiliates to perpetuate wrongs and injustices, including by using Beximco's alter ego affiliates to tortiously interfere with the Agreement, inducing Beximco to breach the exclusivity restrictions of the Agreement, and depriving Indus of its rights and commissions under the Agreement.   To achieve equity, justice necessitates disregarding the corporate forms of Beximco and its alter ego affiliates to hold Messrs. Rahman personally liable for tortiously interfering with the Agreement.

120.     To the extent such affiliates are not Beximco's alter egos, they are liable for tortious interference.   Messrs. A.S.F. Rahman, Shahryar Rahman, and Shayan Rahman are liable for tortious interference for exercising complete dominance and authority over and using Beximco's affiliates to interfere with the Agreement.   Beximco's affiliates, with full knowledge of the Agreement or its relevant terms and under the direction and control of Messrs. A.S.F. Rahman, Shahryar Rahman, and Shayan Rahman, conspired with Beximco to breach the Agreement.   In particular, Indus is informed and believes that Messrs. A.S.F. Rahman, Shahryar Rahman, Shayan

---

[11] *See supra* ¶88 n.9.

Rahman, and the affiliates at all relevant times knew and currently know of Beximco's obligations to sell products to customers in the United States and Canada exclusively through Indus and pay commissions on those sales to Indus.  Indus is further informed and believes that Messrs. A.S.F. Rahman, Shahryar Rahman, Shayan Rahman, and the affiliates acted intentionally to facilitate, induce, or procure Beximco's breaches of the Agreement, and understood that such breaches would substantially disrupt Indus's contractual relationship with Beximco and deprive Indus of the fruits of its bargain with Beximco.  For example, Indus is informed and believes that, under the direction and control of Messrs. A.S.F. Rahman, Shahryar Rahman, and Shayan Rahman, the affiliates (i) sold Beximco's products to customers in the United States and Canada on Beximco's behalf without Indus's involvement, (ii) participated in Beximco's practice of over-invoicing orders of products destined for customers in the United States and Canada to enable Beximco to underreport its income from such orders, (iii) solicited orders for Beximco's products from customers within the United States and Canada, and/or (iv) ordered products from Beximco without Indus's involvement.

121.    As a result of the actions of Messrs. A.S.F. Rahman, Shahryar Rahman, and Shayan Rahman, and the affiliates, Indus has suffered substantial injury.  Indus has been deprived of millions of dollars of commission payments to which Indus is entitled.  The actions of Messrs. A.S.F. Rahman, Shahryar Rahman, and Shayan Rahman, and the affiliates have also damaged Indus's reputation and precluded Indus from realizing the value of relationships with customers to whom Beximco or the affiliates have sold product without Indus's involvement.  Indus invested substantial resources to develop Beximco's business within the United States and Canada after executing the Agreement.  Beximco and the affiliates have benefitted from that investment, but Indus has been denied its contractual compensation according to the Agreement.  Messrs. A.S.F.

Rahman, Shahryar Rahman, and Shayan Rahman, and the affiliates have also deprived Indus of the ability to further develop Beximco's business within the United States and Canada, and thereby earn additional commission income and establish fruitful relationships with additional customers, through the affiliates' disruption of Indus's contractual relationship with Beximco. Indus is thus entitled to compensation, plus interest, for all the injuries it has suffered or will suffer resulting from the conduct of the affiliates.

122.    In addition, Indus is informed and believes that, at all relevant times, Messrs. A.S.F. Rahman, Shahryar Rahman, and Shayan Rahman, and the affiliates acted willfully, intentionally, maliciously, fraudulently, with wanton negligence, and in a conscious or utter disregard for Indus's rights. Messrs. A.S.F. Rahman, Shahryar Rahman, and Shayan Rahman, and the affiliates have no legitimate justification for their misconduct in facilitating, inducing, or procuring Beximco's breaches of the Agreement. As a result, in addition to compensatory damages, Indus is entitled to recover punitive damages from the affiliates as an appropriate remedy for their misconduct.

## FIFTH CAUSE OF ACTION

### Declaratory Relief

### (Against Beximco)

123.    Indus realleges and incorporates by reference each allegation contained in the paragraphs above as though fully set forth herein.

124.    A current and actual controversy exists between Indus and Beximco regarding their respective rights and obligations under the Agreement. Indus claims it has fully complied with its obligations under the Agreement, whereas Beximco has breached the Agreement by, among other things, failing to timely pay commissions owed, failing to provide Indus with monthly statements describing all orders of Beximco's products in the United States and Canada, and failing to comply

6801275

with Indus's demand that Beximco submit to an independent audit of its accounting records. Because of those material breaches, Indus is entitled to compensation. Beximco has also never terminated the Agreement in accordance with the Agreement's provisions.

125.    Indus is informed and believes, and on that basis alleges, that Beximco denies these claims and contends that Indus has breached the Agreement and that Beximco previously terminated the Agreement.

126.    Based on the above alleged facts, Indus seeks a judicial declaration of its rights under the Agreement, including a declaration that the Agreement has not been terminated and instead continues to impose obligations on Beximco that Beximco is breaching.

## SIXTH CAUSE OF ACTION

### Fraud

### (Against Ahmed Sohail Fasihur Rahman and Beximco)

127.    Indus realleges and incorporates by reference each allegation contained in the paragraphs above as though fully set forth herein.

128.    As set forth above, Beximco is liable for breach of contract and breach of the covenant of good faith and fair dealing for, among other things, failing to pay Indus commissions on all sales of textile or apparel products to the United States or Canada completed or facilitated by Beximco or its alter-ego affiliates.

129.    In the unlikely event that Beximco's affiliates are not found to be Beximco's alter egos such that Beximco owes no commissions on sales completed by those affiliates, then as an alternative to Indus's allegations that Beximco breached the Agreement and the covenant of good faith and fair dealing by failing to pay commissions on sales completed by Beximco's affiliates,

Beximco is liable for fraud.[12]  Beximco and all the alter ego affiliates in Beximco's Textile and Apparel Division are subject to the control, dominion, and authority of Mr. A.S.F. Rahman, who possesses the power to unilaterally overrule all officers, directors, and managers on any matter relating to Beximco or its alter ego affiliates.  In fact, in emails, Mr. A.S.F. Rahman referenced his ability to control the Chief Executive Officer of Beximco's Textile and Apparel Division, and, during his deposition, Mr. A.S.F. Rahman testified that he controls and oversees the operations of Beximco, including its textile interests.  The former Chief Executive Officer of Beximco, Mr. Husain, testified that Mr. A.S.F. Rahman "very closely managed" the financial reports for Beximco's Textile and Apparel Division.  Moreover, recent criminal investigations have uncovered evidence of Mr. A.S.F. Rahman's involvement in Beximco's money-laundering scheme.  Mr. A.S.F. Rahman has used his unlimited dominion, control, and authority over Beximco and its alter ego affiliates to perpetuate wrongs and injustices, including by defrauding Indus, breaching the exclusivity restrictions of the Agreement, depriving Indus of its rights and commissions under the Agreement, and subjecting Beximco and its affiliates to criminal investigations and money-laundering charges.  To prevent fraud and achieve equity, justice necessitates disregarding the corporate forms of Beximco and its alter ego affiliates to hold Mr. A.S.F. Rahman personally liable for fraud committed by Beximco, in addition to fraud Mr. A.S.F. Rahman individually committed against Indus.

130.    In the fall of 2016, Beximco's executive Syed Naved Husain flew to New York City to meet with Indus regarding the Parties' partnership and described Beximco to Indus as a vertically integrated entity that had the capability to manufacture textile materials, convert those

---

[12] For the avoidance of doubt, Indus does not concede that Beximco's self-serving interpretation of the Agreement is correct, and so asserts this fraud claim only in the alternative.

materials to finished garments, and ship textile and apparel products to customers in the United States or Canada. Based on these and similar descriptions, Indus understood that Beximco received the revenues generated by sales of textile and apparel products manufactured and exported by Beximco's Textile and Apparel Division. At no point during that discussion or before the Agreement was signed did Beximco tell Indus that Beximco accomplished these activities through affiliated entities or that Beximco did not receive revenue from sales of textile or apparel products manufactured by those entities. To the contrary, Beximco concealed this from Indus.

131. In February 2017, Mr. A.S.F. Rahman repeated Mr. Husain's fraudulent statements. Mr. A.S.F. Rahman likewise flew to New York City to meet with Indus regarding the Parties' contemplated partnership and to negotiate the potential terms of an agreement. During that meeting, Mr. A.S.F. Rahman represented to Indus that Beximco was a vertically integrated entity that could manufacture textile materials, convert them to finished garments, and ship them to customers in the United States and Canada. Mr. A.S.F. Rahman affirmatively misrepresented that Beximco owned the manufacturing facilities located within Beximco Industrial Park, which is inconsistent with Beximco's recently articulated position that those facilities are affiliates independent of Beximco. Based on Mr. A.S.F. Rahman's misrepresentations, Indus continued to believe that Beximco received the revenues generated by sales of textile and apparel products manufactured and exported by Beximco's Textile and Apparel Division. Mr. A.S.F. Rahman never told Indus that Beximco did not receive such revenues and accomplished these manufacturing and export activities through affiliated entities. To the contrary, Mr. A.S.F. Rahman concealed this from Indus.

132. Mr. A.S.F. Rahman and Beximco knew that Indus was ignorant of this concealment. Indeed, while negotiating the Agreement, Indus made clear that it believed Beximco

received revenue from sales of textile and apparel products manufactured at the Beximco Industrial Park, and it communicated its expectation that Indus would be paid a commission on all sales of such products to the United States and Canada under the Agreement. Beximco did not dispute or otherwise correct this understanding or expectation. In fact, Beximco instead inserted provisions into the Agreement suggesting the opposite: that Indus's understanding was correct.

133.    On information and belief, Mr. A.S.F. Rahman misrepresented and concealed the nature of the relationships between Beximco, Beximco's Textile and Apparel Division, and the alter ego affiliates comprising Beximco's Textile and Apparel Division so that Beximco could benefit from Indus's reliance on its misrepresentations and resulting confusion, including by exploiting Indus's understanding of its obligations under the Agreement as inuring to the benefit of Beximco and all of its alter ego affiliates while minimizing Beximco's corresponding obligations and liabilities (most notably, to pay commissions to Indus). Beximco's and Mr. A.S.F. Rahman's fraudulent misconduct was made clear in recent depositions of Beximco and its executives, where they took the position that the word "Beximco" in the Agreement only includes Beximco, Ltd.—a definition that contradicts the Parties' understanding and practice and Mr. A.S.F. Rahman's and Beximco's representations.

134.    Indus reasonably relied on Mr. A.S.F. Rahman's and Beximco's fraudulent concealment. Because the Agreement required Indus to invest significant resources to promote the products manufactured by Beximco and its affiliates, Indus reasonably expected that it would be compensated for every sale of such products to the Territory.

135.    Indus was harmed by Mr. A.S.F. Rahman's and Beximco's fraudulent concealment. Indus committed significant resources to promoting Beximco's products, working with Beximco's factories, and supporting Beximco's sales processes. In return, Beximco refused to pay Indus

commissions on every sale of textile and apparel products to the Territory.  Despite those sales totaling hundreds of millions of dollars, one of Beximco's affiliates paid only a couple hundred thousand dollars in commission payments after the Agreement was executed.  Indus has thus been deprived of millions of dollars of additional revenue it expected to receive under the Agreement.

136.    As a remedy for Mr. A.S.F. Rahman's and Beximco's fraudulent concealment, Indus is entitled to recover all compensatory damages it suffered, including the commissions Indus expected to receive under the Agreement.  On information and belief, Mr. A.S.F. Rahman's and Beximco's fraudulent concealment was intentional, willful, malicious, committed with wanton negligence, and committed in a conscious or utter disregard for Indus's rights.  Neither Mr. A.S.F. Rahman nor Beximco has any legitimate justification for their misconduct.  As a result, in addition to compensatory damages, Indus is entitled to recover punitive damages as an appropriate remedy for Mr. A.S.F. Rahman's and Beximco's willful, malicious, and fraudulent concealment of material facts from Indus.

## PRAYER FOR RELIEF

**WHEREFORE**, Indus prays for judgment against Defendants as follows:

1.    Damages in an amount to be proven at trial;

2.    Double damages under New York Labor Law §§ 191-a, 191-b, 191-c;

3.    Punitive damages;

4.    Prejudgment interest;

5.    Attorneys' fees;

6.    Costs;

7.    A judicial declaration that Beximco breached the Agreement and that Indus complied with its obligations under the Agreement; and

6801275

8.      Such other relief as the Court deems just and proper.


## **JURY DEMAND**

Indus demands a trial by jury on all claims for which trial by jury is proper.


Dated:  January 13, 2025                    HUESTON HENNIGAN LLP


By: _____
       Moez M. Kaba
       Nicholas Kellum
       1 Little W 12th Street
       New York, NY 10014
       Telephone: (646) 930-4046
       mkaba@hueston.com
       nkellum@hueston.com

       Neil G. Anderson
       Justin Greer
       620 Newport Center Dr., Suite 1300
       Newport Beach, CA 92660
       Telephone: (949) 229-8640
       nanderson@hueston.com
       jgreer@hueston.com


       *Attorneys for Plaintiff*
       *Indus Apparel, USA Inc.*